JUDGE GRIESA

08 CV 4469

PROSKAUER ROSE LLP
Joseph Baumgarten
Steven Yarusinsky
1585 Broadway
New York, New York 10036
T: (212) 969-3000
F: (212) 969-2900
*Attorneys for Defendant*
*Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.,*
*"Rabobank Nederland"*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTOR MAKAROV,<br><br>Plaintiff,<br><br>-against-<br><br>COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., "RABOBANK NEDERLAND",<br><br>Defendant. | Civil Action No. 08 CV 4469 (TPG)<br><br>**NOTICE OF REMOVAL**<br>(Supreme Court: State of New York County of New York, Index No. 08/105353 )<br><br>**ECF Case** |

TO: THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1332 and 1441, Defendant Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank Nederland" (hereafter referred to as "Defendant" or "Rabobank"), by its attorneys Proskauer Rose LLP, hereby files this Notice of Removal for the above-captioned action to the United States District Court for the Southern District of New York from the Supreme Court of the State of New York, County of New York, Index No. 08/105353, where the action is now pending.

Defendant, by and through the undersigned counsel, respectfully states the following as grounds for removal of this action:

**PARTIES AND DIVERSITY OF CITIZENSHIP**

1. On or about April 11, 2008, Plaintiff Victor Makarov ("Plaintiff" or "Makarov") commenced this civil action by filing a Verified Complaint in the Supreme Court of the State of New York, County of New York, Index No. 08/105353. Rabobank was notified of service of the Summons and Verified Complaint, as effected by the New York State Department of Banking, on or about April 30, 2008. A copy of the Summons and Verified Complaint is annexed hereto as Exhibit A. No other process, pleadings or orders have been served on Defendant in the state court action.

2. Rabobank is a citizen of a foreign state in that it is a cooperative banking organization organized under the laws of The Netherlands.

3. Victor Makarov is a citizen of the State of Connecticut.

4. Accordingly, there exists complete diversity of citizenship between Plaintiff and Defendant pursuant to 28 U.S.C. § 1332.

**AMOUNT IN CONTROVERSY**

5. The Verified Complaint alleges a claim for age discrimination in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, Section 8-107(1)(a), known as the New York City Human Rights Law.

6. The Verified Complaint states that Plaintiff is seeking $5,000,000 (five million dollars) in compensatory damages and $20,000,000 (twenty million dollars) in punitive damages.

7. Without conceding that Plaintiff is entitled to any damages from Defendant, it is apparent on the face of the Verified Complaint that the amount of damages prayed for exceeds $75,000 (seventy-five thousand dollars), exclusive of interests and costs.

8. Accordingly, this action is removable pursuant to 28 U.S.C. §§ 1332 and 1441. Plaintiff and Rabobank are citizens of different states and, the amount in controversy exceeds $75,000.

**NOTICE AND PROCESS**

9. This Notice of Removal was timely filed pursuant to 28 U.S.C. § 1446(b), given that it is being filed within thirty (30) days after receipt by Rabobank of a copy of the Summons and Verified Complaint.

10. Venue is proper in this Court.

11. Promptly after filing this Notice of Removal, Defendant will give written notice thereof to Schwartz & Perry LLP, attorneys for Plaintiff. Defendant will also file copies of this Notice of Removal with the Clerk of the Supreme Court of the State of New York, County of New York pursuant to 28 U.S.C. § 1446(b).

12. Accompanying this Notice of Removal is a Civil Cover Sheet.

13. The removal of this action to the Southern District of New York does not waive Defendant's ability to assert any defense in this action. Defendant reserves the right to amend or supplement this Notice of Removal.

14. This Notice is executed pursuant to Federal Rule of Civil Procedure 11.

**WHEREFORE**, Defendant respectfully requests that this action proceed in the United States District Court for the Southern District of New York as a matter properly removed thereto.

Dated: May 13, 2008

PROSKAUER ROSE LLP

By: [signature]

Joseph Baumgarten
Steven Yarusinsky

(jbaumgarten@proskauer.com)
1585 Broadway
New York, New York 10036
T: (212) 969-3000
F: (212) 969-2900
*Attorneys for Defendant Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank Nederland"*

To: Murray Schwartz, Esq.
Schwartz & Perry, LLP
295 Madison Avenue
New York, New York 10017

EXHIBIT A

B199— Summons without notice, Supreme Court, personal or substituted service 12 pt type, 4-94

© 1993 BlumbergExcelsior, Inc., Publisher, NYC 10013 www.blumberg.com

# Supreme Court of the State of New York

**County of** NEW YORK

Index No. 08/105353
Date purchased 4/15/08

VICTOR MAKAROV,

*Plaintiff(s)*

*against*

COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., RABOBANK NEDERLAND,

*Defendant(s)*

Plaintiff(s) designate(s) New York County as the place of trial.

The basis of the venue is Defendant Rabobank's principle place of busin

## Summons

Plaintiff(s) reside(s) at

County of

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated, April 7, 2008

Attorney(s) for Plaintiff
SCHWARTZ & PERRY, LLP
Office and Post Office Address
295 Madison Avenue
New York, New York 10017
(212) 889-6565

Defendant's address:

Cooperatieve Centrale Raiffsen-
Boerenleenbank B.A. Rabobank Nederland
245 Park Avenue
New York, New York 10167

NEW YORK
COUNTY CLERK'S OFFICE

APR 15 2008

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK,
COUNTY OF NEW YORK

-----------------------------------------------------------------------X

VICTOR MAKAROV,

*Plaintiff,*

-against-

COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., RABOBANK NEDERLAND,

*Defendant.*

-----------------------------------------------------------------------X

**Index No.:** 08/105353

**VERIFIED COMPLAINT**

NEW YORK
COUNTY CLERK'S OFFICE
APR 15 2008
NOT COMPARED
WITH COPY FILE

Plaintiff, Victor Makarov ("Makarov"), as and for his Verified Complaint against Defendant, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Rabobank Nederland, all upon information and belief, respectfully alleges as follows:

**IDENTITY OF PARTIES**

1. At all relevant times mentioned herein, Plaintiff Victor Makarov ("Makarov") was employed by Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Rabobank Nederland ("Rabobank"), as Regional Head of Market Risk, and performed his duties in the County, City and State of New York for ten years from July 7, 1997, until his unlawful termination on November 2, 2007.

2. Defendant Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Rabobank Nederland is a cooperative organization involved in international banking, who at all relevant times mentioned herein, operated a licensed branch in the County, City and State of New York, from which facility Makarov performed his duties for Rabobank during his ten years of employment, including at the time of his unlawful termination.

**BACKGROUND RELEVANT TO ALL CAUSES OF ACTION**

3. In July 1997, Makarov commenced his employment as Regional Head of Market Risk with Rabobank in the County, City and State of New York, where he would remain employed for the next ten years until his termination, based upon the discriminatory reason of his age.

4. At the time Makarov commenced his employment with Rabobank in July 1997, as the Regional Head of Market Risk, he already had excellent academic credentials, having received his Ph.D. in Mathematics and Theoretical Physics from the Academy of Sciences of the Union of Soviet Socialist Republics in Moscow.

5. Makarov was not only recognized within Rabobank, but was also well-known in the Risk Management industry, as well, having fifteen years experience in Risk Management, assessing market risk for other major financial service providers, such as Chase Manhattan Bank, Security Pacific Financial Strategies, Inc. and Merrill Lynch, which made his experience and knowledge of the Risk Management industry highly desirable to Rabobank.

6. As further tribute to Makarov's expertise and knowledge of the Risk Management industry, he was often invited to lecture and give training sessions at various Risk Management conferences, and is an adjunct professor of Financial Engineering and Risk at Brooklyn Polytechnic University, and Makarov is presently serving his second term as a member of the Board of Trustees of the Global Association of Risk Professionals (GARP).

7. At all relevant times herein, Makarov was qualified for his position at Rabobank, and performed his duties in a fully satisfactory manner, as confirmed by, among other things, the fact that Makarov was hired and trusted to resuscitate Rabobank's New York Risk Management system, which had been a significant problem for Rabobank and would not have been entrusted to Makarov if he was a poor performer.

8. Makarov was hired by Rabobank in response to what Makarov was advised was a warning letter from the Federal Reserve that Rabobank had received, stating that all trading operations would be adversely impacted unless Rabobank's Risk Management was greatly improved.

9. Hiring Makarov as the new Head of Risk Management, with proven experience and excellence in the industry, was one of the most crucial components in Rabobank's effort to comply with the Federal Reserve.

10. Makarov successfully spearheaded Rabobank's Risk Management upgrade, which was largely completed by the end of 1998, at which time the Federal Reserve gave Rabobank a positive audit evaluation.

11. Makarov was an essential participant in the upgrade of Rabobank with respect to the requirement that Rabobank comply with regulations and protocols directed to the control of risk requirements.

12. As further evidence of Makarov's fully satisfactory performance during his employment at Rabobank, all reviews by regulators and examiners from the Federal Reserve, the State of New York, Dutch Central Bank, and internal audits rated the New York Market Risk Management, which was headed by Makarov, as adequate and found it compliant with the rules and regulations controlling the protection against risk, which was a requirement with which Rabobank was obligated to comply.

13. From 1997, when Makarov commenced his employment with Rabobank, until his termination ten years later, Makarov's value to Rabobank was recognized and confirmed by positive annual reviews, bonuses and the increased duties and responsibilities assigned to him, such as creating and chairing the activities of the New Business Committee.

14. During the course of his employment with Rabobank, Makarov reported to two supervisors: (I) the Regional Risk Manager in New York; and (ii) the Global Market Risk Manager in Utrecht, Netherlands.

15. From the commencement of Makarov's employment in 1997 to his unlawful termination on November 2, 2007, the individuals occupying the supervisory positions of Regional Risk Manager in New York and the Global Market Risk Manager in Utrecht changed, on numerous occasions, as follows:

(i) *Regional Risk Manager*: Poly Coe ("Coe") from 1999 to 2001; Jim Cunningham ("Cunningham") from 2001 to 2003; Hans Hanaart ("Hanaart") from 2003 to 2005; and Andre

Blom ("Blom") from 2005 to present.

(ii) *Global Market Risk Manager*: Robert Armstrong ("Armstrong") from 1997 to 2001; Maarten Rosenberg ("Rosenberg") from 2001 to 2003; Raymond Moonen ("Moonen") from 2003 to 2005; Marc van Balen ("van Balen") from 2005 to van Balen's resignation in 2007; and Rosenberg, currently acting as interim manager.

16. While reporting to Blom and van Balen, Makarov performed his services effectively and to the entire satisfaction of both Blom and van Balen, as exemplified by, but not limited to, Blom giving Makarov an "exceeds expectations" rating in his 2006 annual evaluation, given in 2007, and Blom apologizing that he could not offer a bigger bonus to correctly reflect Makarov's performance because of sudden cuts in the bonus pool.

17. In or around 2001, Sheldon Sussman ("Sussman"), who was employed by Rabobank in the Structuring and Portfolio Management Group for Rabobank International, was promoted to the position of Head of Global Financial Markets for Rabobank in the Americas, working primarily out of New York City, in the same office where Makarov performed his services.

18. Sussman, who was based in New York City, was required to pass all of his proposed transactions and new business activities through Market Risk Management in Rabobank's office in New York City, as well as the New Business Committee of which Makarov was the Chair, which necessarily meant that Sussman was required to obtain the approval of Makarov for Sussman's transactions and activities in regards to Market Risk, which Makarov would grant pursuant to Rabobank's policies and procedures.

19. Sussman made it clear to Makarov that he had little respect for Risk Management and Makarov's function at Rabobank and was interested essentially in sales and trading revenues and that Makarov respond to Sussman's wishes as quickly as possible, regardless of Rabobank's need to pass all proposed transactions through Risk Management.

20. Sussman desired Makarov to approve Sussman's deals without conferring with the appropriate committees or taking the required steps in the approval process, and Sussman aggressively and unreasonably attempted to induce Makarov to ignore Rabobank's rules and regulations and desired Makarov to simply serve as a rubber stamp, despite the fact that Makarov was required to review Sussman's potential transactions.

21. Sussman, given the clout that he held because of the significant revenues he generated for Rabobank, persistently pressured Makarov to forego the various approval steps that were required for the transactions Sussman proposed.

22. Makarov, however, given his significant credentials and background, refused to ignore the transaction approval procedures, and Makarov was able to ensure that Rabobank's Risk Management procedures would be followed, regardless of the pressures created by Sussman or Market Risk.

23. Sussman engaged in a course of conduct designed and calculated to remove Makarov from his position or to force Makarov to quit, so that Sussman would be able to replace

Makarov with a younger, less experienced person who would be unable to serve as an obstacle to Sussman in Sussman's ongoing effort to ignore procedures designed to protect Rabobank against market risk, as Sussman perceived Makarov had.

24. Sussman, by his conduct and comments, attempted to create the impression that Makarov was unable to perform effectively because of Makarov's age and, therefore, should be removed from Rabobank's workplace due to his age and treated Makarov in a degrading and humiliating fashion, to which Sussman did not subject the younger employees.

25. Sussman's acts, all of which created a hostile environment that Makarov was forced to endure, and which was created by Sussman solely because of Makarov's age included, only by way of example, and among other things:

- Telling Makarov, **"At your age, you don't fit in."**
- Telling Makarov that he **"would rather hire a more junior person in that role."**
- Telling Makarov that he was **"too mature and too senior"** for his position.
- Demanding that Makarov resign and becoming furious and vindictive towards Makarov when Makarov refused to quit.
- Entering Makarov's office and berating Makarov about refusing to cut costs of Market Risk and demanding in a raised tone of voice how he needed **"someone younger who can do it quicker, and be more flexible,"** discriminatorily believing that Makarov, based on his age, was unable to be "flexible."

- Telling Makarov that he could get "two traders for what he is paying Makarov," using compensation as a synonym for age.
- Making it known to Makarov that a younger person would be less demanding in enforcing protection against risk and more interested in the revenue Sussman was generating.

The examples above are not all inclusive, but instead are only examples of the hostile environment that existed at Rabobank because of Sussman's discriminatory belief that Makarov was unable to perform based on his age, which severely, materially and pervasively altered the terms, conditions and privileges of Makarov's employment.

26. Despite Makarov's complaints to his supervisors about Sussman's hostile and intimidating conduct, they were unable and/or unwilling to aid Makarov because of the prominent role that Sussman held within Rabobank due to the substantial revenues Sussman generated.

27. Sussman ultimately desired to remove Makarov and replace him with a younger person who Sussman could control and manipulate and who would establish procedures that were less rigid so that Sussman could have more control over the assumption of risk procedures.

28. Sussman regularly gave preferential treatment to younger people by hiring and promoting them to fill roles in the company, all of whom were younger than Makarov and fit Sussman's discriminatory perception that younger persons would be less rigid and more willing to comply with Sussman's inconsonant demands.

29. Sussman sought to create the impression that Makarov, whose position required Makarov to effectively deal with people, and which he had done during his entire employment with Rabobank, had not done so, and also wanted to construct a paper trail to support Makarov's termination or to make Makarov's workplace so intolerable that he would have no choice but to resign.

30. Nevertheless, and despite Sussman's discriminatory attacks upon Makarov based on his age, Makarov continued to effectively perform for Rabobank, as he had done throughout his employment.

31. In 2006, Sussman, based at least in part on the revenues he generated through the sub-prime mortgage market, was promoted to Executive Vice President, Global Financial Markets, and was relocated to London in 2007.

32. At approximately the same time, Sussman also became a member of the Managing Board for Rabobank International, the committee which manages all of Rabobank's international activities.

33. Despite his relocation to London in 2007, Sussman still remained involved with Rabobank's Global Financial Markets in the Americas, which he supervised, so that Sussman remained involved with Market Risk in the New York City office, which was Makarov's department.

34.     Sussman persisted in his discriminatory belief that Makarov was **"too mature and too senior"** for his position, even demanding that Makarov vacate his office so that Sussman could use it for his occasional visits to the New York office after Sussman was transferred to London.

35.     In or around 2005, André Blom ("Blom") was named as the Regional Risk Manager for Rabobank's office in New York City, therefore becoming Makarov's supervisor.

36.     At the time that Blom became Makarov's supervisor, Blom was approximately 15 years younger than Makarov.

37.     Blom, despite Sussman's discriminatory desire to remove Makarov because of his age, recognized and acknowledged Makarov's qualifications and ability to contribute to Rabobank, and Blom sought and obtained Makarov's assistance.

38.     Blom, who had been employed by Rabobank for a number of years, was involved in the credit side of Rabobank operations but had no formal training or experience in Market Risk Management at Rabobank, or to Makarov's knowledge, at any other banking institution.

39.     All of Blom's direct reports were credit managers who, like Blom, were considerably younger than Makarov and who, like Blom, were not involved in market risk management.

40. Blom socialized on a daily basis with the younger employees and would plan social events outside the workplace, leaving Makarov as the only older employee and the only employee who was not invited to these social activities.

41. Blom was aware of Makarov's academic and business experience and was also aware that Makarov enjoyed a good reputation in the risk management field and quickly learned to accept and employ Makarov's knowledge in persuading those who supervised Blom, that Blom was able to perform the duties of Blom's position as the Managing Director of Risk Management, a position that Blom was not trained or experienced in performing prior to his appointment.

42. During the period in which Blom was attempting to learn the role of Risk Management, Blom, who was considerably younger than Makarov, treated Makarov with the respect one would provide to a mentor.

43. In fact, Blom, in his 2006 mid-year performance review of Makarov, recognized that, among other things, **"Victor is a good mentor and coach for the team."**

44. Throughout the period that Makarov was supervised by Blom, Makarov's positive performance and contribution was repeatedly recognized as Makarov, among other things, initiated and led the upgrading of Risk Watch, a major risk system used in New York to monitor risk of Rabobank's position.

45.    In the summer of 2007, Rabobank suffered significant losses due to its involvement in the sub-prime mortgage market, as did many other financial institutions operating in the United States, who transacted business in the sub-prime mortgage market.

46.    For months prior to the losses Rabobank suffered in the sub-prime mortgage market, Makarov had been advising both his supervisors, namely Blom and Marc van Balen, of the impending crisis developing in the sub-prime market.

47.    In fact, Makarov was so aggressively concerned about the impending sub-prime mortgage crisis that Makarov foresaw that Makarov implemented several new ad-hoc reports that were produced regularly by manually assembling relevant information from various sources, since Rabobank's reporting structure was antiquated.

48.    In fact, Makarov, along with van Balen and Blom, issued a memo dated March 15, 2007, to Maarten Rosenberg, Head of Market and Risk, and sent another memo on June 8, 2007, in addition to Makarov discussing these issues at meetings of the New York Balance Sheet Risk Management Committee (BRMC), Global Market Risk Committee and Global Market Risk conference calls, which contained the following statements and warnings expressed:

- The warning that, "the market for sub-prime loans has deteriorated significantly."

- The statement that, "several firms who specialized in these loans are facing large losses or bankruptcies."

- Makarov also stated that, "NY GFM (Global Financial Management) businesses have both direct and indirect exposure to the sub-prime sector."

- Makarov pointed out that Structured Products Portfolio Management (SPPM), Structured Client Solutions (SCS) and Securitization were all vulnerable to exposure to the sub-prime sector.

- In the memo to Rosenberg, Makarov stated that, "increased volatility in the sub-prime sector" of the mortgage market is a great cause for concern and has led to "increased risk levels."

49. Before the memos dated March 15, 2007 and June 8, 2007 were forwarded they were, in fact, edited by Blom and signed by van Balen, so that at least a portion of each of the memos represented comments that at least Blom or van Balen removed or insisted be included within the memorandum and additional modifications, all of which related to sub-prime developments.

50. In addition to the memos prepared by Makarov, he also forewarned his supervisors of this upcoming mortgage crisis by circulating various market reports such as the UBS Sub-Prime Report of February 2007, which also contained early warnings regarding the mortgage market, and Makarov circulated this report to several Rabobank traders, as well as Blom, van Balen, and Paul Wallis, who was the Head of London Market Risk.

51. The warnings transmitted by Makarov to Senior Managers were designed and intended to warn the appropriate parties of the market risk that were identified in the financial marketplace.

52. In the UBS Sub-Prime Report of February 2007, referred to above, the following guidance was provided by UBS which was transmitted to the appropriate parties at Rabobank, which Makarov believes was ignored by the Senior Management of Rabobank, even though the report Makarov circulated clearly identified the risks:

- The statement that, "Over these past few months, we've [UBS] seen downgrades and bankruptcy filings, tighter credit underwriting standards being incorporated by lenders, and news around deteriorating performance on loans and a weaker housing market."
- The caution that, "[T]he subprime meltdown would affect other parts to the economy..."
- The indication that, "The ABX market has been in absolute turmoil the last few weeks..."
- The warning that, "Home price appreciation will cause a far more dramatic slowdown in subprime..."

53. Despite Makarov's concerns, Rabobank decided to continue on its course created primarily by Sussman, because it had generated vast income for Rabobank.

54. In 2007, Makarov did not receive any indication whatsoever that there was any problems or concerns with his performance, nor was there any indication that Makarov was in any way blamed for the losses associated with Rabobank's activities in the sub-prime mortgage markets, and he was, in fact, not at fault.

55. In late October 2007, Blom was summoned to Utrecht by Senior Management of Rabobank, where it is believed Blom met with certain Senior Management of Rabobank regarding,

among other things, the sub-prime mortgage crisis and the losses sustained by Rabobank.

56. Blom returned from Utrecht on November 1, 2007.

57. On November 2, 2007, the day following Blom's return from Utrecht, Blom said to Makarov:

> **"Victor, you are past 60 now and you have been with the bank for over 10 years. You are entitled to early retirement. It's time to retire. Let younger people do it. Go home and don't come back."**

58. Makarov was terminated on November 2, 2007, when he was 60 years old.

59. Blom's statement to Makarov, described above, made by Blom to Makarov the day following Blom's return from Utrecht strongly and reasonably suggests that age played a role in Rabobank's decision to terminate Makarov.

60. At the time Blom terminated Makarov, Blom provided Makarov with a letter that was starkly different from the consistent feedback that Blom had provided to Makarov, as well as the comments made by Blom in Blom's 2006 year-end evaluation of Makarov, rendering the November 2, 2007 termination letter unjustified and ludicrous.

61. The fact is, the November 2, 2007 termination letter represents a concocted pretext designed to cover-up and camouflage the real reason for Makarov's termination, his age.

62. Blom's claim that Makarov was fired due to Makarov's "difficulty communicating with clients and colleagues both locally and globally about portfolio risks and risk mitigants" was in direct contradiction to Blom's repeated statements, including written statements in Makarov's performance evaluations, prepared and signed by Blom, that Makarov had been "successful" in improving his relationship with Global Financial Markets.

63. Rabobank's headquarters in Utrecht, upon information and belief, decided that Makarov would be held responsible for the losses Rabobank had suffered in the sub-prime mortgage markets, not because of his performance, but because of his age, which made him expendable in relation to the much younger Blom, confirmed by the fact that neither Blom, nor Rabobank, had ever accused Makarov of any of the deficiencies that were described in the November 2, 2007 termination letter until one day after Blom's return from his trip to Utrecht.

64. Instead of terminating Sussman, who Makarov believed was responsible for the initiation, implementation and approval of many of the sub-prime transactions and who was also a member of the Managing Board, or terminating Blom, who had been responsible for Risk in the Americas when the losses took place, Rabobank instead fired Makarov, who reported directly to his supervisor, Blom.

65. Upon information and belief, Sussman's employment with Rabobank concluded in March 2008, under circumstances such that an immediate replacement of Sussman was not announced.

66. Rabobank terminated Makarov instead of his supervisor, Blom, because Blom was almost 15 years younger than Makarov and offered an employment longevity to Rabobank that Makarov, being 60 years old, could not furnish.

67. The fact is Makarov, who had far less employment longevity available to him, was terminated so that Blom was spared termination, solely because of his younger age, and Makarov, because of his older age, was terminated.

68. The sub-prime mortgage crisis provided the opportunity for Rabobank to remove Makarov by blaming the crisis on Makarov, even though Sussman had exposed Rabobank to very large losses, Blom was the Managing Director of Risk Management in the Americas and also Makarov's supervisor and other senior management persons at Rabobank had authority to control the extent of Rabobank's involvement in sub-prime risks.

69. Blom, it is believed, was a willing party to the creation of the pretext that was then created by Rabobank to cover up Rabobank's desire to terminate Makarov because Makarov was then 60 years of age and expendable, in relation to the much younger Blom.

70. Attached to Blom's 2006 evaluation of Makarov's performance was a statement which contained, in part, "**Victor has set the stage for a major improvement in the infrastructure of the market risk organization**."

71. One of the reasons given for his termination was that Makarov "did not give Rabobank an adequate warning of risk" and was "unable to raise his level of involvement during the time that the United States financial markets were in distress," which is clearly pretextual as Makarov, on his own initiative, transmitted to Rabobank management reports of potential dangers due to the sub-prime exposures, established by Sussman and condoned by Rabobank, only to secure greater income regardless of the risks involved.

72. The truth is that Makarov followed precisely all the Market Risk policies and procedures expressed in the Market Risk Manual, LCS and other relevant documents, and as early as February 2007, Makarov identified early indications from the market trend indicator (ABX index) and alerted Global Market Risk of this situation during a weekly conference call and wrote several memos on the analysis of the sub-prime position on the New York books starting February 2007 and continuing throughout that year.

73. The Termination Notice also alluded to Makarov's "difficulty communicating with clients and colleagues both locally and globally about portfolio risks and risk mitigants," which is also clearly pretextual, as Makarov communicated both verbally and in writing via daily risk monitoring reports, daily and weekly meetings, weekly conference calls, daily and constant

communications with traders on the floor, and regular visits to offices in Latin America, California, London and Utrecht and repeated dealings with the Federal Reserve and other governmental regulators, all of which could readily be confirmed, including the work of Makarov with the Federal Reserve and other governmental regulations.

74. Market Risk was never blamed for Rabobank's losses from the sub-prime mortgage market fallout, and it was only after Rabobank decided to terminate Makarov based on his age that it concocted a pretext blaming Makarov, after the fact, for Rabobank's knowing involvement in the sub-prime mortgage crisis, a pretext Rabobank designed to cover up its age discrimination of Makarov.

75. In fact, if Makarov was as incompetent as depicted in the Termination Notice, Rabobank violated its obligations under the operative banking regulations as well as its obligations to businesses with which it had a relationship, to the regulatory agencies that controlled it, to its clients and all others that relied upon Rabobank's performance because they continued Makarov, despite his alleged poor performance, to remain in its employ.

76. Makarov has suffered from the adverse effects of the age discrimination and the quality of his life has been irreparably damaged and his self-esteem, self-respect and well-being have been irreversibly harmed because he was subjected to the intimidating and humiliating type of conduct described herein, for which Makarov has been required to seek medical attention, all of which will continue into the future and remain a source of humiliation, anguish, and financial

loss to Makarov for the remainder of Makarov's working life, so that the quality of Makarov's life has been significantly damaged as a result of the age discrimination he endured from Rabobank.

**AS AND FOR THE CAUSE OF ACTION ON BEHALF OF MAKAROV AGAINST RABOBANK FOR AGE DISCRIMINATION IN VIOLATION OF CHAPTER 1, TITLE 8, §8-107(1)(a) OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK**

77. Makarov repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 76 of this Complaint, as though fully set forth at length herein.

78. The entirety of the acts which constitute and form this Cause of Action, as set forth above, all of which are deemed repeated and re-alleged herein as though said paragraphs were specifically set forth herein, were perpetrated against Makarov while he was in the course of his employment with Rabobank.

79. At the time Makarov was subjected to the discriminatory conduct described herein, Makarov was 60-years-old, and therefore, was in a protected class under the New York City Human Rights Law.

80. Throughout his employment with Rabobank and up to the time of his unlawful termination, which was an adverse employment action, Makarov was fully qualified for his position and performed his duties in that position, in a fully satisfactory fashion and was in a position to continue doing so, so that Makarov expected and was fully qualified to carry on similar

activities for the remainder of his reasonable work expectancy.

81. Given the circumstances surrounding Makarov's termination from Rabobank, including, among other things, and only by way of example: (a) Blom's statements to Makarov, at the time he terminated Makarov, that Makarov is "**past 60 now**" and is "**entitled to early retirement**," that he should "**[l]et younger people do it**," and that he should "**go home and don't come back**;" (b) Sussman's statements to Makarov, including, "**[a]t your age, you don't fit in**," that he "**would rather hire a more junior person in that role**" and that Makarov was "**too mature and too senior**" for his position; as well as the falsity of the reasons set forth for Makarov's termination, there is a genuine inference that the real reason Makarov was fired was because of his age.

82. The aforementioned acts of Rabobank constitute unlawful discrimination against Makarov, based on Makarov's age, in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(1)(a), known as The New York City Human Rights Law, which provides, *inter alia* that:

> It shall be an unlawful discriminatory practice... [f]or an employer or an employee or an agent thereof, because of the actual or perceived age... of any person... to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

83. Rabobank was obligated to maintain a workplace free of hostility and to prevent its employees from violating any laws designed to prevent unlawful discrimination in employment and therefore is legally responsible and liable to Makarov for the acts of its supervisory employees

toward him that resulted in an adverse employment action against Makarov in violation of the New York City Human Rights Law.

84. The fact is Makarov, who had far less employment longevity available to him, was terminated by Rabobank solely because of his older age.

85. As a result of Rabobank's unlawful conduct, Makarov has been adversely affected in his employment and in his normal life's pursuits was caused, permitted and allowed to suffer extreme humiliation, ridicule, mental anguish and emotional distress and suffered the symptoms of such injuries and was required to seek care to address these injuries, all in an effort to reduce the devastating effects of Rabobank's acts and the destructive effect they have had and will continue to have upon the quality of his life.

86. In addition to being adversely affected in his employment and suffering a significant loss of income and benefits, Makarov has been irreparably, personally and professionally, humiliated, demeaned and degraded, all of which has been caused by Rabobank's outrageous conduct due to discrimination based on Makarov's age, in violation of Makarov's human rights.

87. As a direct and proximate result of Rabobank's violation of the New York City Human Rights Law §8-107(1)(a), Rabobank is liable to Makarov pursuant to §8-502(a) of said statute for "damages including punitive damages," and pursuant to §8-502(f) of said statute for "costs and reasonable attorney's fees" based on the lodestar method, as has been judicially

established and accepted as a means of calculating attorney's fees, when they are properly available under the law, as they are here, and for pre-judgment interest.

88. As a direct and proximate result of Rabobank's conduct complained of herein, and as alleged in this Cause of Action, as well as the conduct set forth in this Complaint, Makarov has suffered damages, injuries and losses, both actual and prospective, which include the irreparable loss of income for the remainder of his working career, damage to his career and the emotional pain and suffering Makarov has been caused to suffer, all of which Rabobank should be required to pay Makarov in the amount of Five Million Dollars ($5,000,000) in compensatory damages.

89. Here, the acts of Rabobank were so reprehensible and were committed with malice and/or reckless indifference in the face of a perceived risk that its actions would violate Makarov's rights under the New York City Human Rights Law, so that, in addition to the damages inflicted upon Makarov and in addition to all the other measures of relief to which Makarov may properly be entitled herein, Rabobank should also be required to pay punitive damages as punishment for its discriminatory and egregious conduct in the further and additional amount of Twenty Million Dollars ($20,000,000), in order to deter Rabobank and others similarly situated from engaging in such conduct in the future.

90. Makarov, therefore, seeks compensatory damages in this Cause of Action, including, among other things, for loss of earnings and loss of earning capacity and for the emotional harm inflicted upon him in the sum of Five Million Dollars ($5,000,000), and the additional and

further sum of Twenty Million Dollars ($20,000,000) for punitive damages, making a total of Twenty-Five Million Dollars ($25,000,000), plus the costs of this action, as well as reasonable attorney's fees and for pre-judgment interest on this Cause of Action.

**WHEREFORE**, Plaintiff Victor Makarov demands judgment against Rabobank on the Cause of Action in the sum of Five Million Dollars ($5,000,000) in compensatory damages and the further and additional sum of Twenty Million Dollars ($20,000,000) in punitive damages, for a total of Twenty-Five Million Dollars ($25,000,000), plus costs of this action, pre-judgment interest and reasonable attorney's fees as is permitted under the law, calculated by the lodestar method, as permitted under the law, and for such other relief as this Court deems just and proper.

**SCHWARTZ & PERRY, LLP**
*Attorneys for Plaintiff*

By: ______________________
MURRAY SCHWARTZ
BRIAN HELLER
295 Madison Avenue
New York, New York 10017
(212) 889-6565

SUPREME COURT OF THE STATE OF NEW YORK,
COUNTY OF NEW YORK

--------------------------------------------------------------------X

VICTOR MAKAROV,

*Plaintiff,*

-against-

COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., RABOBANK NEDERLAND,

*Defendant.*

--------------------------------------------------------------------X

**Index No.:**

**VERIFICATION**

STATE OF NEW YORK )
)ss:
COUNTY OF NEW YORK )

VICTOR MAKAROV, being duly sworn, says:

I am the Plaintiff in the within action; I have read the foregoing Complaint and know the contents therefore; the same is true to my knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

Victor Makarov

VICTOR MAKAROV

Sworn to me this 7th
day of April 2008

NOTARY PUBLIC

BRIAN A. HELLER
Notary Public, State of New York
No. 02HE6081654
Qualified in New York County
Commission Expires October 7, 2010